MICHAEL CLASTRIER *v.* THE SUN MUTUAL INSURANCE COMPANY OF NEW ORLEANS.

In order to entitle shippers to recover for alleged damage to merchandize, while on a voyage, it must satisfactorily appear that the damage occurred while the merchandize was in charge of the carrier and under his control, and the result of his negligence or want of skill.

APPEAL from the Sixth District Court of New Orleans, *Howell*, J. *J. A. Maybin* and *Henry J. Leovy*, for appellant.

TALIAFERRO, J. In April, 1857, the plaintiff shipped, by his agents in this city, from New Orleans to New York, on the ship Silas Holmes, three cases or boxes containing fine and costly merchandise, consisting of embroidery and laces, then recently imported from France. The defendants insured the goods to the amount of $22,000. The plaintiff alleges, that during the voyage the ship encountered stormy weather, which produced much leakage of the vessel, from which cause the goods insured were greatly damaged by sea water. That on the arrival of the ship at New York, the boxes were opened and the goods found wet and badly injured; that a survey and sale of the damaged goods was made in New York at public auction, under the authority of the Port Wardens, and that the sales amounted to $4,824 42. The plaintiff prays judgment for $14,365 29, the difference between the valuation of the goods, by J. A. Brands, a witness, and the amount realized by the auction sale. He also prays for interest and costs.

The defendants specially deny that the goods were damaged during the voyage by any of the perils or risks insured against. They also specially deny that the goods were worth the sum stated in the policy of insurance,

and aver that the sum is enormously excessive and fraudulent. They allege that the proceedings, prior to and attendant on the alleged sale, were irregular, illegal and fraudulent.

The judgment of the Court below was in favor of the plaintiff, and was based upon the valuation made by Biddle and Brunemaire, at a cash estimate of $13,659 47. The judgment was for $8,835 08, with legal interest from May, 15th, 1857, and all costs of suit.

Both parties have appealed.

Several bills of exception appear in the record, but we do not deem their consideration important in the decision of this case.

The testimony of numerous witnesses, the most of them residing in New York, was taken under commission, and the record is quite voluminous. It appears, by the evidence on the part of the plaintiff, that in the latter part of the month of March, 1857, M. Clastrier shipped the three cases of merchandise, which constitute the subject of this litigation, from New York to New Orleans, on the ships Black Warrior and Philadelphia, consigned to Messrs. A. Pepin & Co. of this city. That they were re- ceived and kept by them about two weeks. It being found that the market at that time in New Orleans was unfavorable for the sale of goods of that character, these cases were, by order of the plaintiff, reshipped to New York, by Messrs. A. Pepin & Co., on the Silas Holmes, as before stated, and the bill of lading forwarded to Messrs. Van Wyck, Townsend & Warren, auctioneers of that city, for the purpose of having the goods sold at auction.

It will be proper, first, to consider the evidence adduced by the parties in relation to the question, whether the goods were damaged while on board the Silas Holmes, and by any of the perils or risks insured against.

It appears from the plaintiff's evidence that the goods in question were carefully put up in cartons or paper boxes, and these deposited in the three large wooden cases which were forwarded to New Orleans on the Black Warrior and the Philadelphia, in the latter part of March, 1857 ; that the goods at the time they were so packed away in these cases, were new, clean, fashionable and in good order ; that the cases were put on board these vessels on a clear, dry day ; that they were received in New Orleans in good order, by Messrs. A. Pepin & Co., who placed them away carefully in their store, and who, afterwards, as before stated, returned them to New York on the Silas Holmes, putting them on board that ship in good order and free from any stains upon the boxes ; that when the boxes or cases were opened in New York, the goods they contained were found to have been wet and much damaged by water. It also further ap- pears from the plaintiff's testimony, that the Silas Holmes, during the voyage from New Orleans to New York, encountered continuous stormy weather, from the 25th April until the 2d May. This fact is shown by the protest made by the captain of the Holmes after the arrival of the vessel in New

York. In that protest it is set forth, that during the tempestuous weather the vessel labored heavily, that the force of the storm caused her to strain and pitch violently, and to make more water than usual, and that the pumps were worked day and night. From these facts the plaintiff holds the inference to be clear, that the damage arose during the voyage from the leakage of the vessel during the storm.

On the part of the defence, it is shown, by the testimony of the captain and mate of the Silas Holmes, that the three cases containing the plaintiff's goods were carefully stowed away near the stern of the vessel, under the cabin, and between decks, at the height of thirteen feet above the bottom or floor of the vessel, a deck or floor intervening between the cases and the bottom of the ship; that these cases remained in the place where they were put during the entire voyage; that at no time during the storm was there a depth of more than eleven or twelve inches of water in the hold from leakage, and that the ship was pumped every two or four hours. They further state that the cases were delivered on the wharf about three days after the arrival of the vessel at New York, in good, fair condition, and that no objection was made by the drayman to receive them. The mate says the cases were delivered upon the wharf in the same good condition they were in when received on board ; that he saw no mark of damage upon them, and that, had there been any, he would have seen it, as he was on the wharf attending to the delivery of the freight. The testimony of the two officers as to the condition of the cases when they were delivered, is corroborated by the evidence of several other witnesses, particularly by Wright and Washburn, who swear that the cases were particularly noticed by them, and that they were dry, clean, free from stain and in good order. Wright produced the receipt of Acher, the drayman, showing the receipt of the cases in good order. Butler, the port warden, testifies to the good condition of the cases. Nelson, a witness, states that a survey of the cargo of the Silas Holmes was taken, and that no report was made by the inspector. Acher, the drayman, relied upon by plaintiff to show the bad condition of the cases when delivered, only says they were muddy in spots, th·t they had the appearance of being old and having been frequently handled and moved about. Several witnesses testified as to the condition and appearance of the goods after the cases had been opened at the auction store of Messrs. VanWyck, Townsend & Warren, in New York, and as to whether the damage was caused by fresh or salt water. Four witnesses state their belief, that the damage of the goods by water was not a thing of recent occurrence. One of the witnesses thought that several weeks had intervened; another, several months. Butler, the port warden, says, in his evidence, that after the first examination he told the parties that the goods had been a long time damaged, and that he had his doubts as to their having been damaged on the Silas Holmes on her voyage from New Orleans to New York ; that he was requested to give a salt-water certifi-

cate, but refused. He said there was no damage on the outside of the cases. Metcalf, a witness, says the cases were in good condition. He thought the damage the goods had sustained, was of long standing. He was not able to say whether or not the goods had been wet with salt water. Morris, another witness, says the cartons were much mildewed and rotten, and must have been wet a long time. Rosey, a witness, says the damage was not caused by salt water. Brunemaire, a witness, says the damage was of recent occurrence, and caused by salt water. States that he applied some of the articles to his mouth, and discovered a salt-ish and bitter taste. The statements of Biddle, a witness, as to the kind of water by which the goods became wet, seem somewhat contradictory, and but little can be drawn from his evidence touching that point.

It is shown on the part of the defence, that pecuniary inducements were held out to Butler, the port warden, in order to influence him to give a salt-water certificate, a thing which we have seen he refused to do. Butler states, in his testimony, that VanWyck, the auctioneer, proposed to him, that if he would give a salt-water certificate of damage on the goods, an arrangement could be made which would be to his individual advantage; that a very large amount of goods would be sold at auction, and out of which he might make something handsome; and that if he wanted a check for $500 or $1,000 it was at his service. VanWyck states, in his own testimony, that Mr. Brunemaire said, that if the port wardens would give a certificate that the goods were damaged by sea-water on the voyage of importation, he would give some money. Brunemaire, it appears, was the personal friend of the plaintiff, and seems to have evinced an undue solicitude to promote his interest.

We find nothing in the evidence showing the precise day or time the cases containing the goods were opened. They were put in the store of the auctioneers, on the 8th May, and sold on the 15th of the same month. It is fair to suppose the goods were opened soon after they were received by the auctioneers, in order that they might be displayed before the day of sale, for the inspection of those inclined to purchase.

Having briefly recapitulated the evidence of the parties touching the inquiry we set out with, we will now examine the character and force of that evidence.

It is seen that the evidence on the part of the plaintiff is entirely inferential, a species of proof which, to be conclusive, must logically flow from antecedent facts clearly established. The inference maintained by the plaintiff would have been much strengthened had he succeeded in showing, in addition to his other facts, that the cases containing the merchandise had reached New York in a wet and damaged condition, showing their recent contact with water. But in this he signally failed. The storm which the Silas Holmes encountered, terminated on the 2d May, and the vessel entered port two days afterwards. There would seem to be a strong probability that if during the storm the cases had been pene-

trated by a quantity of water, sufficient to produce the effects upon the cartons and goods within, which it is shown were produced, some external mark of leakage, dampness or stain' would have been visible upon the sides or bottoms of the cases. But no such indication was observed. The inference sought to be established by the plaintiff is met by positive evidence on the part of the defendants. They show, by the captain and mate of the vessel, that the cases containing the plaintiff's goods were not at all damaged or effected by water during the voyage, and the reasons why they were not. The plaintiff points out, it is true, a difference of manner and tone in the testimony of the captain as a witness, and the declarations sworn to in his protest, and on that account would impeach his credibility, as well as that of the mate. But we see no discrepancy in the facts stated, and do not deem the statements made in different forms materially incompatible. The testimony of the two officers as to the dry, clean and good condition of the boxes when delivered upon the wharf at New York, is abundantly sustained by other witnesses.

It does not appear satisfactorily that the goods were damaged by sea water. One witness swears positively to a saltish, bitter taste perceived on applying some of the damaged articles to his mouth. Another witness swears that the damage did not proceed from sea water. The majority of the witnesses who were present at the examination of the goods, were unable to determine this question, but were clear in their convictions that a considerable space of time had elapsed since the occurrence of the injury. From the general tenor of the evidence, we think the presumption legitimate that the goods were not damaged on board the Silas Holmes ; and this presumtion is made stronger by the efforts made by indirection, to use the mildest term, to obtain the greatly desired sea-water certificate. Upon the whole, we conclude that the evidence adduced on the part of the defence preponderates. Under this view of the essential inquiry in the controversy, an examination of the other points in the case would be nugatory.

It is therefore ordered, adjudged and decreed, that the judgment of the District Court be annulled, avoided and reversed, that judgment be rendered in favor of the defendants, the plaintiff appellee paying costs in both Courts.

HOWELL, J., recused.